KASSRA P. NASSIRI (215405)
(knassiri@njfirm.com)
CHARLES H. JUNG (217909)
(cjung@njfirm.com)
NASSIRI & JUNG LLP
47 Kearny Street, Suite 700
San Francisco, California  94108
Telephone:     (415) 762-3100
Facsimile:     (415) 534-3200

Attorneys for Plaintiffs and the Putative Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| IN RE: FACEBOOK PRIVACY LITIGATION | Case No. 10-cv-02389-RMW<br><br>CLASS ACTION<br><br>**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>ACTION FILED:  05/28/10<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Wendy Marfeo and Katherine Pohl ("Plaintiffs") bring this suit on behalf of themselves and all others similarly situated, and make the following allegations on information and belief, except as to allegations pertaining to Plaintiffs, which are based on their personal knowledge:

### I.   INTRODUCTION

1.      Plaintiffs bring this class action complaint against Facebook, Inc. ("Facebook") for disclosing its users' sensitive personally identifiable information ("PII") with Facebook's advertising partners, in violation of Facebook's own privacy policy, Facebook's specific and prominent promises to users, accepted industry standards, and federal law.

2.      Facebook's own policies state "[w]e never share your personal information with our advertisers" and "[w]e do not give your content of information to advertisers without your consent."

Facebook touts these statements in multiple areas of its site including its privacy policy and multiple posts on its official blog.

3.      Unbeknownst to its users, and in clear contrast to Facebook's own stated policies, Facebook intentionally and knowingly transmitted PII, including users' real names, to third party advertisers without user consent.

## II.    PARTIES

4.      Plaintiff Wendy Marfeo is a resident of Johnston, Rhode Island.  She is a registered user of Facebook's services and has been since at least 2008. During the relevant time period, Plaintiff Marfeo clicked on at least one third-party advertisement displayed on Facebook.com.  In registering as a Facebook user and using Facebook's services, including clicking on advertisements, Ms. Marfeo relied on Facebook's promises regarding the privacy of her personal data.

5.      Plaintiff Katherine Pohl is a resident of San Rafael, Marin County, California. She is a registered user of Facebook's services and has been since at least 2008. During the relevant time period, Plaintiff Pohl clicked on at least one third-party advertisement displayed on Facebook.com. In registering as a Facebook user and using Facebook's services, including clicking on advertisements, Ms. Pohl relied on Facebook's promises regarding the privacy of her personal data.

6.      Defendant Facebook, Inc. (hereinafter, "Facebook") is a Delaware corporation that maintains its headquarters in Santa Clara County, California.  Facebook conducts business throughout California and the nation.

## III.    JURISDICTION AND VENUE

7.      This Court has personal jurisdiction over Facebook because (a) a substantial portion of the wrongdoing alleged in this complaint took place in this state, (b) Facebook is authorized to do business here, has sufficient minimum contacts with this state, and/or otherwise intentionally avails itself of the markets in this state through the promotion, marketing and sale of products and services in this state, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and 1332(d) because the amount in controversy exceeds

$5,000,000.00 exclusive of interest and costs, and more than two-thirds of the users of the putative class are citizens of states different than that of Facebook.  Additionally, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) and (c).  A substantial portion of the events and conduct giving rise to the violations of law complained of herein occurred in this District.  Facebook's principal executive offices and headquarters are located in Santa Clara County, California.

## IV.   STATEMENT OF FACTS

### A.      About Facebook

10.     Facebook is the world's largest social networking website, with over 500 million registered users worldwide.

11.     According to Facebook, its "mission is to give people the power to share and make the world more open and connected."[1]  To accomplish that mission, Facebook allows anyone with access to a computer and Internet connection to register for its services free of charge.

12.     One of the few requirements Facebook places on its registrants is that they provide their actual names, rather than merely a pseudonymous username, as is commonplace with other website registrations.

13.     Once registered, a Facebook user may post a multitude of information to their own personal "Facebook profile" page, including their birth date, place of birth, current and past addresses, present and past employment, relationship status, personal pictures, videos, and more.

14.     Each Facebook user's account is tied to a user ID number ("UID") and/or username that uniquely identifies the individual.  Armed with knowledge of a user's UID or username, a person is able to access the user's real name, gender, picture, friends, networks, interests, photos, and any other information located on the user's profile page.

15.     In many ways, Facebook is accomplishing its stated mission.  Facebook users store and share an unprecedented amount of personal information through its service.  While users may

---

[1] http://www.facebook.com/facebook?v=info%ref=pf

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**          **Case No. 10-cv-02389-RMW**

share this information in order to connect with other Facebook users, they are also sharing this information with Facebook itself. And all this personal information is valuable to Facebook because it is valuable to advertisers.

**B.     Facebook's Business Model**

16.     Facebook consumers pay for Facebook's products and services with their personal information. In other words, Facebook users provide their valuable PII to Facebook in exchange for access to facebook.com and for Facebook's promises not to disclose their PII to third parties without consent.

17.     This business model allows users to contract with Facebook: users provide valuable PII; Facebook provides valuable services backed by privacy promises. This business model also allows Facebook to make money because of the inherent monetary value of PII.

18.     From a revenue perspective, Facebook is an advertising platform. It makes money much like television shows, magazines, newspapers, and other successful media—by selling advertising.

19.     What separates Facebook from traditional media is its uninhibited and unprecedented access to information about those individuals who will view the ads that Facebook sells to advertisers.

20.     Historically, advertisers relied upon demographic sampling and other means to make educated guesses at the characteristics and preferences of consumers. In contrast, Facebook actually knows the true identities, likes and dislikes of users. Accordingly, Facebook is an incredibly compelling advertising platform. Advertisers need not guess as to whether any given advertisement will reach the appropriate demographics; Facebook can and does assure each advertiser that their advertisements will reach precisely the right audience. Therefore, Facebook's access to user PII makes advertising on Facebook more effective, efficient and valuable for advertisers, and in turn, more valuable to Facebook.

21.     If not for the inherent and identifiable value of its users' PII, Facebook's business model would collapse. Thus, its promises concerning the safeguarding of the personal consumer

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**          **Case No. 10-cv-02389-RMW**

data Facebook receives in exchange for its products and services are vital to its business and to its advertising partners.

22.     This business model—providing online services to consumers and profiting from selling access to their PII to third-parties—has burgeoned into a multi-billion dollar per year industry.[2]

23.     Indeed, consumers themselves are beginning to recognize the value of their own PII, and online giant Google has contemplated paying consumers for their personal data.  As reported by the *Wall Street Journal*, a confidential internal Google document outlined ways Google could profit from its vast databases of personal information, including allowing users to "opt-in to share their personal data in return for direct benefits (e.g., [Google] will pay for all/part of [the user's] ISP bill or other affiliate/coupon benefits)."[3]  In the document, Google also contemplates that "Google can build a data exchange / trading platform allowing individual data owners to transact with others directly, or openly sell their data to any bidders."[4]  In fact, as reported by the *Wall Street Journal*, consumers ***can*** now sell their own data for considerable and measurable sums of money, thus realizing the sort of gains that Facebook is accustomed to generating from the sale of personal data.[5]

## C.     Advertising on Facebook

24.     Users store an enormous amount of personal information on Facebook's servers. Facebook uses this information in conjunction with its advertising partners to target users based upon highly specified criteria.

---

[2] *Unboxed—Rewarding Consumers for Providing Personal Data*, http://www.nytimes.com/2010/07/18/business/18unboxed.html?_r=1

[3] *Google:  Into the Future*, http://online.wsj.com/public/resources/documents/info-flash10.html?project=GOOGLEDOCS1008

[4] *Google Agonizes on Privacy as Ad World Vaults Ahead*, http://online.wsj.com/article/SB10001424052748703309704575413553851854026.html

[5] *Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**          **Case No. 10-cv-02389-RMW**

25.     Targeted advertisements drive Facebook's bottom line.  Utilizing the tremendous amount of user data stored on its systems, Facebook has buoyed to become the preeminent conduit of online advertising in the world.[6]

26.     The information that Facebook possesses about its users allows its advertising partners to target users based on age, city of residence, gender, and interests—such as mountain biking, for example.  Using this data, an advertiser providing services for a mountain biking store in Utah can direct ads to 20 to 30-year old men in Moab, Utah who have expressly shared with Facebook an interest in mountain biking.

27.     The underlying user-inputted data used to facilitate the highly targeted advertising described above is extremely valuable and coveted by virtually all companies conducting business online.  Extending the hypothetical above, the only thing better for an advertiser would be to know the true identity of that 20-something male mountain biker.  Equipped with that information, the advertiser could reach out personally to the individual, collect additional information contained on the user's profile to further entice him, and/or begin to develop a digital dossier about the user to target advertisements to him in the future.  But Facebook's own Privacy Policy prohibits this. Facebook's Privacy Policy specifically states:

> **How We Use Your Information**
>
> **To serve personalized advertising to you.**  We don't share your information with advertisers without your consent.  (An example of consent would be if you asked us to provide your shipping address to an advertiser to receive a free sample.) We allow advertisers to choose the characteristics of users who will see their advertisements and we may use any of the non-personally identifiable attributes we have collected (including information you may have decided not to show to other users, such as your birth year or other sensitive personal information or preferences) to select the appropriate audience for those advertisements. For example, we might use your interest in soccer to show you ads for soccer equipment, but we do not tell the soccer equipment company who you are…

Facebook's Privacy Policy, http://www.facebook.com/policy.php (last visited May 31, 2010) (emphasis in original).

---

[6] http://www.comscore.com/Press_Events/Press_Releases/2010/5/Americans_Received_1_Trillion_Display_Ads_in_Q1_2010_as_Online_Advertising_Market_Rebounds_from_2009_Recession.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**          **Case No. 10-cv-02389-RMW**

28.     Facebook makes similar representations in its Privacy Guide:

> **We never share your personal information with our advertisers.**
> Facebook's ad targeting is done entirely anonymously. If advertisers select
> demographic targeting for their ads, Facebook automatically matches those
> ads to the appropriate audience. Advertisers only receive anonymous data
> reports.

Controlling How You Share, http://www.facebook.com/privacy/explanation.php (last visited May 31, 2010)(emphasis in original).

29.     Likewise, Facebook's Statement of Rights and Responsibilities reads:

> About Advertisements on Facebook
>
> Our goal is to deliver ads that are not only valuable to advertisers, but also
> valuable to you. In order to do that, you agree to the following:
>
>    1. You can use your privacy settings to limit how your name and profile
> picture may be associated with commercial or sponsored content served by us.
> You give us permission to use your name and profile picture in connection
> with that content, subject to the limits you place.
>
>    2. **We do not give your content or information to advertisers without
> your consent.**

Statement of Rights and Responsibilities, http://www.facebook.com/terms.php (last visited on May 31, 2010) (emphasis added).

30.     Facebook's management officials have consistently made similar statements on the official Facebook Blog.  Facebook's Director of Corporate Communications and Public Policy posted the following on April 5, 2010:

> Still others asked to be opted-out of having their information shared with
> advertisers. This reflects a common misconception about advertising on
> Facebook. **We don't share your information with advertisers unless you
> tell us to** (e.g. to get a sample, hear more, or enter a contest). Any assertion to
> the contrary is false. Period. Instead, we enable advertisers to target
> anonymized demographics and attributes. That is, a company selling boats can
> target people between 40 and 50 years old who expressed an interest in
> boating. However, we never provide the advertiser any names or other
> information about the people who are shown, or even who click on, the ads.

The Facebook Blog, http://blog.facebook.com/blog.php?post=379388037130 (last visited May 31, 2010) (emphasis added).

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**        Case No. 10-cv-02389-RMW

31.     In response to widespread concern about the privacy of user information, on February 16, 2009, Facebook's CEO, Mark Zuckerberg, reiterated that personal information would not be shared without user consent:

> Our philosophy is that people own their information and control who they share it with.  When a person shares information on Facebook, they first need to grant Facebook a license to use that information so that we can show it to the other people they've asked us to share it with.  Without this license, we couldn't help people share that information … In reality, we wouldn't share your information in a way that you wouldn't want.  The trust you place in us as a safe place to share information is the most important part of what makes Facebook work.

The Facebook Blog, http://blog.facebook.com/blog.php?post=54434097130 (last visited October 6, 2010).

32.     Through these and other representations, Facebook has consistently and adamantly promised not to share any user's specific identity or personal information with its advertising partners.

33.     Facebook requires its users to agree to its Privacy Policy upon registering with the site.  Users must affirm that they "have read and agree[d] to" Facebook's Terms of Use (a hyperlink to the document entitled Statement of Rights and Responsibilities) and Facebook's Privacy Policy.

**D.     Facebook Violates Its Privacy Policy**

34.     In direct violation of its own Privacy Policy and of the representations quoted above, Facebook shares its users' sensitive information with third party advertisers without its users' knowledge or consent.

35.     When a Facebook user clicks on an advertisement posted on Facebook's website, Facebook sends a "Referrer Header" to the corresponding advertiser.  The Referrer Header reveals the specific web page address the user was viewing prior to clicking the advertisement.  Through the design of its system, Facebook sends Referrer Headers containing UIDs and the usernames to advertisers.

36.     When a Facebook advertiser receives a Referrer Header identifying the user who clicked an ad, the advertiser is essentially granted access to obtain substantial additional information

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**                    **Case No. 10-cv-02389-RMW**

about the user, such as the user's name, gender, picture, friends, networks, interests, photos, and more.

37.     Thus, Facebook advertisers gain even more detailed user information: not just anonymous user demographics, but specific information about individual users including real name, gender, friends, interests, and more.  Facebook's systems send this information to advertisers despite Facebook's Privacy Policy and its other representations as to users' privacy vis-à-vis advertisers.

**E.     The Scope and Duration of Facebook's Nonconsensual Disclosures**

38.     On information and belief, Facebook began disclosing communications containing user's usernames/UIDs no later than February 2010 when Facebook implemented a website "upgrade" that began to embed ever more detailed data within Referrer Headers.

39.     These disclosures continued until the publication of a May 21, 2010 article in the *Wall Street Journal*[7] and a May 21, 2010 posting to the website of Professor Benjamin Edelman of the Harvard Business School[8] exposed Facebook's practices. According to the *Wall Street Journal* publication, **after** being contacted by the *Journal*, Facebook admitted that it had been passing data to ad companies that could allow those companies to tell if a particular user was clicking an ad. Facebook finally ceased the nonconsensual transmissions only after researchers discovered them.

**F.     The Risks of Referrer Header Leakage**

40.     The privacy risks attendant with leaking Referrer Header's containing sensitive information are well known and documented in the IT industry.

41.     The HTTP Referrer Header is a standard web browser function provided by web browsers since the HTTP 1.0 specification in May 1996.[9]  The current version of the publicly-available HTTP specification, RFC 2616,[10] provides for HTTP Referrer Headers in its provision 14.36.[11]

---

[7] http://online.wsj.com/article/SB10001424052748704513104575256701215465596.html.

[8] http://www.benedelman.org/news/052010-1.html

[9] http://www.w3.org/Protocols/rfc1945/rfc1945

[10] http://www.w3.org/Protocols/rfc2616/rfc2616.html

[11] http://www.w3.org/Protocols/rfc2616/rfc2616-sec14.html#sec14.36

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**                    **Case No. 10-cv-02389-RMW**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

42.     It is well known that if a company inserts sensitive information, such as username or UID into a URL, then the company risks disclosing this information whenever a user clicks a link to a third-party website.  Indeed, the drafters of the HTTP specification specifically flagged this risk; in section 15.1.3, the HTTP specification advises developers of substantially the same actions described in the instant case: "Authors of services which use the HTTP protocol SHOULD NOT use GET based forms for the submission of sensitive data, because this will cause this data to be encoded in the REQUEST-URI."[12]

43.     Facebook's software engineers knew or should have known that private user information would be divulged as a result of Facebook's website re-design.  Facebook was put on specific notice of the problem with their Referrer Headers when, in August 2009, Balachander Krishnamurthy and Craig E. Wills published an article titled, "On the Leakage of Personally Identifiable Information Via Online Social Networks."[13]  In this article, the authors detail the problem of Facebook and other sites sharing with advertisers information that the sites previously promised to protect.  The authors specifically sent this article to Facebook.  Facebook confirmed its knowledge of the Krishnamurthy *et al.* article in September 2009.[14]

44.     This unauthorized disclosure of a person's identity and what Facebook page they were viewing could have the effect of revealing to advertisers confidential and sometimes highly sensitive information, including a user's private interests. For example, if a Facebook user who was gay and struggling to come out of the closet was viewing the Facebook page of a gay support group, and then clicked on an ad, the advertiser would know the exact identity of that person, and that s/he was viewing the Facebook page of a gay support group just before navigating to their site.

## V.       CLASS ACTION ALLEGATIONS

45.     Plaintiffs brings this action on behalf of themselves and all other persons in the following similarly-situated class: ***all Facebook users in the United States who, at any time after***

---

[12] http://www.w3.org/Protocols/rfc2616/rfc2616-sec15.html#sec15.1.3

[13] http://conferences.sigcomm.org/sigcomm/2009/workshops/wosn/papers/p7.pdf.

[14] http://www.mediapost.com/publications/index.cfm?fa=Articles.showArticle&art_aid=114344.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**                    **Case No. 10-cv-02389-RMW**

1

2  ***May 28, 2006 clicked on a third-party advertisement displayed on Facebook.com*** (the "Class").

3  Excluded from the Class are Facebook, its officers and directors, legal representatives, successors or

4  assigns, any entity in which Facebook has or had a controlling interest, the judge to whom this case

5  is assigned and the judge's immediate family.

6     46. Every member of the proposed Class is a party to Facebook's Terms and Conditions

7  and Privacy Policy as alleged herein.

8     47. The Class is composed of numerous people, whose joinder in this action would be

9  impracticable.  The disposition of their claims through this class action will benefit Class members,

10  the parties and the courts.  Since 2006, Facebook has grown from millions of users to over 500

11  million users.  Upon information and belief, there are millions of persons in the Class.

12     48. Upon information and belief, the identities and contact information of the individual

13  members of the Class are available through Facebook's electronic records.

14     49. There is a well-defined community of interest in questions of law and fact affecting

15  the Class.  These questions of law and fact predominate over individual questions affecting

16  individual Class members, including, but not limited to, the following:

17    a. what and how personally-identifiable data and advertisement click information was

18     transmitted to advertisers;

19    b. whether Facebook violated its Terms of Service, Privacy Policy, and other representations to

20     users by making its users' personal information and advertisement click information

21     available to advertisers without authorization;

22    c. whether any Class member knew or consented to Facebook's transmission of personally-

23     identifiable data to advertisers;

24    d. whether Class members are entitled to damages as a result of Facebook's conduct, and, if so,

25     what is the measure of those damages;

26    e. whether Facebook's conduct described herein violated the Electronic Communications

27     Privacy Act, 18 U.S.C. § 2510 *et seq.* (the "ECPA");

28    f. whether Facebook's conduct described herein Stored Communications Act, 18 U.S.C. § 2701

   *et seq.*(the "SCA");

g.  whether Facebook's conduct described herein violated California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*);

h.  whether Facebook's conduct described herein violated California's Computer Crime Law (Cal. Penal Code § 502);

i.  whether Facebook's conduct described herein violated the California Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*);

j.  whether Facebook's conduct described herein constitutes a breach of contract; and

k.  whether Facebook was unjustly enriched as a result of its conduct described herein.

50.  Facebook engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Class members.  Similar or identical statutory and common law violations, business practices and injuries are involved.  Individual questions, if any, pale by comparison to the numerous common questions that dominate.

51.  The injuries sustained by members of the Class flow, in each instance, from a common nucleus of operative facts.  In each case, Facebook caused or permitted unauthorized communications of private and personally identifying information to be delivered to third parties without adequate or any notice, consent or opportunity to opt out.

52.  Given the similar nature of the Class members' claims and the absence of material differences in the statutes and common laws upon which the Class members' claims are based, a nationwide class will be easily managed by the Court and the parties.

53.  Because of the relatively small size of the individual Class members' claims, no Class user could afford to seek legal redress on an individual basis.

54.  Plaintiffs' claims are typical of those of the Class as all members of the Class are similarly affected by Facebook's uniform and actionable conduct as alleged herein.

55.  Facebook has acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**                    **Case No. 10-cv-02389-RMW**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

56.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seek to represent.

57.     Plaintiffs reserve the right to revise the above class definition based on facts learned in discovery.

**COUNT I**
**(Breach of Contract)**

58.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

59.     In order to register for and use its social-networking website, Facebook required that Plaintiffs and the Class affirmatively assent to its Terms and Conditions and Privacy Policy (the "Agreement").

60.     The Agreement's provisions constitute a valid and enforceable contract between Plaintiffs and the Class on the one hand, and Facebook on the other.

61.     Under the Agreement, Plaintiffs and the Class transmitted sensitive personally-identifiable information to Facebook in exchange for use of Facebook and Facebook's promise that it would not share that personal information with third parties, including but not limited to advertisers, without their authorization.

62.     Facebook users pay for Facebook's services with their personal information. Facebook's users exchange something valuable—access to their personal information—for Facebook's services and Facebook's promise to safeguard that personal information.  In particular, Facebook promises that any personal information submitted by its users will only be disclosed to advertisers in the specific ways and circumstances set out in Facebook's privacy policy and with user consent.

63.     Facebook collects revenues in large part because the personal information submitted by its users increases the value of Facebook's advertising services.  Because Facebook has access to highly personal information about its users, Facebook's advertising platform is particularly attractive to advertisers and marketers who can and do use that personal information to deliver highly-targeted

-13-

ads to Facebook's users.  In this regard, Facebook's services are vehicles to acquire personal information about consumers in order to sell that personal information to advertisers.

64.     If not for the inherent and identifiable value of access to personal consumer information, Facebook would be much less profitable.  Thus, its promises concerning the safeguarding of the personal information Facebook receives from its users in exchange for its services are vital to its business and its users.

65.     Facebook's practices—providing services to consumers and profiting from the sale of personal information to advertisers—have helped Facebook achieve a valuation exceeding $30 billion.

66.     Facebook materially breached the terms of the Agreement through its unlawful conduct alleged herein, including its disclosure of Plaintiffs' and the Class's personal information to its advertiser partners.

67.     As a result of Facebook's misconduct and breach of the Agreement described herein, Plaintiffs and the Class suffered damages. Plaintiffs and the Class members did not receive the benefit of the bargain for which they contracted and for which the paid valuable consideration in the form of their personal information, which, as alleged above, has ascertainable value to be proven at trial. In other words, Plaintiffs and each Class member gave up something of value, PII, in exchange for access to Facebook and Facebook's privacy promises. Facebook materially breached the contracts by violating its privacy terms, thus depriving Plaintiffs and Class members the benefit of the bargain. Thus, their actual and appreciable damages take the form of the value of their PII that Facebook wrongfully shared with advertisers. Plaintiffs also seek nominal damages based on Facebook's breach of the Agreement, and disgorgement from Facebook of the proceeds that Facebook wrongfully obtained by breaching the Agreement.

## COUNT II
### (Violation of Cal. Civ. Code §§ 1572 & 1573)

68.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

-14-

69.    Cal. Civ. Code § 1572 provides in relevant part that actual fraud exists when a party to a contract suppresses "that which is true, by one having knowledge or belief of the fact" "with intent to deceive another party thereto, or to induce him to enter into the contract."

70.    Cal. Civ. Code § 1573 provides in relevant part that constructive fraud exists "[i]n any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

71.    Facebook violated § 1572 through its repeated and explicit false assertions that it would not share the identity of its users with its advertisers without consent, as described herein. Facebook further violated this section by suppressing its knowledge of this fact.  Plaintiffs Marfeo and Pohl relied on Facebook's false assertions in contracting with and using Facebook.

72.    Additionally and/or alternatively, Facebook violated § 1573 by breaching its duty to protect its users' identities from its advertisers and gaining an advantage in doing so, by misleading its users to their prejudice, as described herein.

73.    Plaintiffs, on behalf of themselves and the Class, seek damages from Facebook, including but not limited to disgorgement of all proceeds Facebook obtained from its unlawful business practices.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for the following relief:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiffs Marfeo and Pohl as class representatives, and appoint their counsel as class co-counsel;

B.    Declare that Facebook's actions, as described herein, constitute breach of contract and fraud;

C.    Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including, *inter alia*, an order prohibiting Facebook from engaging in the wrongful and unlawful acts described herein;

D.    Disgorge Facebook of all revenue unjustly earned from displaying third-party advertising on Facebook.com during the class period;

E.      Awarding damages, including statutory damages where applicable, to Plaintiffs and the Class in an amount to be determined at trial;

F.      Awarding all economic, monetary, actual, consequential, compensatory, equitable and nominal damages caused Facebook's conduct, and if its conduct is proved willful, award Plaintiffs and the Class exemplary damages;

G.      Award restitution against Facebook for all money to which Plaintiffs and the Class are entitled in equity;

H.      Awarding Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

I.      Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

J.      Awarding such other and further relief as equity and justice may require.

Dated:  May 29, 2015                          Respectfully submitted,
                                              NASSIRI & JUNG LLP

                                               /s/ Kassra P. Nassiri
                                              Kassra P. Nassiri
                                              Attorneys for Plaintiffs and the Putative Class


## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  May 29, 2015                          Respectfully submitted,
                                              NASSIRI & JUNG LLP

                                               /s/ Kassra P. Nassiri
                                              Kassra P. Nassiri
                                              Attorneys for Plaintiffs and the Putative Class