KASSRA P. NASSIRI (215405)
(kass@njfirm.com)
NASSIRI & JUNG LLP
47 Kearny Street, Suite 700
San Francisco, California 94108
Telephone: (415) 762-3100
Facsimile: (415) 534-3200

Attorneys for Plaintiffs and the Putative Class

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE: FACEBOOK PRIVACY LITIGATION | Case No. 10-cv-02389-RMW<br><br>CLASS ACTION<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>**[FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER]**<br><br>Date:        January 29, 2016<br>Time:        9:00 a.m.<br>Courtroom: 6<br>Judge:       Hon. Ronald M. Whyte<br>Trial Date:  None Set |

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

    **PLEASE TAKE NOTICE** that on January 29, 2016 at 9:00 a.m. or as soon thereafter as the matter may be heard in Courtroom 6 of the above-captioned Court, located at 280 South 1st Street, San Jose, California 95113, Representative Plaintiffs Katherine Pohl and Wendy Marfeo, on behalf of themselves and the putative class (hereinafter "Plaintiffs"), will, and hereby do, move for class certification of Plaintiffs' claims for breach of contract and fraud against Defendant Facebook, Inc. ("Facebook").

    This motion is brought pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on the ground that Plaintiffs' claims against Facebook can and should be adjudicated on a classwide basis. The evidence submitted demonstrates that Plaintiffs have satisfied the requirements of Rule 23(a) and 23(b)(3) and that class certification is appropriate.

    This Motion is based upon this Notice, the following Memorandum of Points and Authorities, the Request for Judicial Notice and Declaration of Kassra P. Nassiri and exhibits thereto (including excerpts of deposition testimony) submitted herewith, the pleadings and papers on file herein, any other matters of which the Court may or must take judicial notice, and any other matters and written and oral argument or evidence that may be presented to the Court at or before the hearing.

Dated: October 28, 2015                NASSIRI & JUNG LLP

                                    /s/ Kassra P. Nassiri
                                    Kassra P. Nassiri
                                    Attorneys for Plaintiffs and the Putative Class

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................- 1 -

II.   STATEMENT OF ISSUES TO BE DECIDED ...........................................- 2 -

III.  STATEMENT OF THE RELEVANT FACTS ............................................- 2 -

   A.  Facebook's Agreements with its Users...............................................- 2 -

   B.  Facebook's Nonconsensual Disclosures of Users' Personal Information. ...................- 4 -

   C.  Class Members' Damages Resulting from Facebook's Conduct.................................- 9 -

IV. ARGUMENT .............................................................................................. - 10 -

   A.  Class Certification Should Be Granted Under Rule 23........................ - 10 -

   B.  An Identifiable and Ascertainable Class Exists. ............................... - 11 -

   C.  The Class Meets All Requirements Under Rule 23(a)........................ - 11 -

      1.  The Class is Sufficiently Numerous. ....................................... - 11 -

      2.  The Commonality Requirement Is Satisfied............................. - 12 -

      3.  Typicality is Satisfied Here..................................................... - 17 -

      4.  Plaintiffs and Their Counsel Will Adequately Represent the Interests of Class Members.................................................................... - 18 -

   D.  The Class Satisfies the Requirements of Rule 23(b)(3). ................... - 19 -

      1.  Common Questions Predominate Over Individualized Issues............ - 19 -

      2.  Class Litigation Is the Superior Means of Resolving Class Members' Claims. ...- 23 -

V.  CONCLUSION .......................................................................................... - 24 -

# TABLE OF AUTHORITIES

**CASES**

*Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 887, 92 Cal. Rptr. 723 (1971) .................. 13

*Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 44 Cal. Rptr. 2d 352 (1995) ..................... 16

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) .......................................................... 19, 23

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001)................................................................... 10

*Barkouras v. Hecker*, Civ. No. 06-0366 (AET), 2006 WL 3544585 (D.N.J. Dec.8, 2006).......... 24

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) ............................................................. 11, 23

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 277 Cal. Rptr. 40 (1990) .......................................................................................................................... 14

*Brazil v. Dell Inc.*, No. C–07–01700 RMW, 2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) .. *passim*

*Breeden v. Benchmark Lending Group, Inc.*, 229 F.R.D. 623 (N.D. Cal. 2005) ........................... 11

*Chun-Hoon v. McKee Foods Corp.*, No. C-05-620 VRW, 2006 WL 3093764 (N.D. Cal. Oct. 31, 2006)............................................................................................................................ 11, 19

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)................................................................... 23

*Dalton v. Lee Publications, Inc.*, 270 F.R.D. 555 (S.D. Cal. 2010)................................................ 17

*Delagarza v. Tesoro Ref. & Mktg. Co.*, No. C–09–5803 EMC, 2011 WL 4017967 (N.D. Cal. Sept. 8, 2011).............................................................................................................................. 19

*DuFour v. Be LLC*, 291 F.R.D. 413 (N.D. Cal. 2013) ......................................................... 12, 13

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ................................................................. 10

*Engalla v. Permanente Med. Group, Inc.*, 15 Cal. 4th 951, 64 Cal. Rptr. 2d 843 (1997) ............. 15

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012)....................................... 12

*Facciola v. Greenberg Traurig LLP*, 281 F.R.D. 363 (D. Ariz. 2012)......................................... 13

*Farhang v. Indian Inst. of Tech.*, No. C–08–02658 RMW, 2010 WL 2228936 (N.D. Cal. June 1, 2010)............................................................................................................................... 15

*General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)............................................ 12, 17

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)......................................................... 12

*Haywood v. Barnes*, 109 F.R.D. 568 (E.D.N.C. 1986) ............................................................. 18

*In re Facebook Privacy Litig.*, 572 Fed. App'x. 494 (9th Cir. 2014) ........................................... 18

*In re Mego Financial Corp. Secur. Litig.*, 213 F.3d 454 (9th Cir. 2000)........................................ 18

*Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682 (7th Cir. 2013)....................................................... 21

*Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014) ....................................................... 12

*Kamm v. California City Dev. Co.*, 509 F.2d 205 (9th Cir. 1975) ................................................. 23

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) ........................................................ 23

*Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ............................... 12, 15, 17

*MindGames, Inc. v. Western Pub. Co.*, 218 F.3d 652 (7th Cir. 2000) ........................................... 15

*Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355, 134 Cal. Rptr. 388 (1976) ............. 16, 22

*Randle v. Spectran*, 129 F.R.D. 386 (D. Mass 1988)................................................................. 18

*Robinson v. Sheriff of Cook County*, 167 F.3d 1155 (7th Cir. 1999) ............................................ 19

*Rodriguez v. West Pub. Corp.*, 563 F.3d 948 (9th Cir. 2009) ..................................................... 18

*Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474 (E.D. Cal. 2006) .................................. 19

*Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003) ........................... 21, 22

*Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008)........................................................................................................... 12, 17, 19

*Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294 (N.D. Ohio 2009)............................................ 18

*Sweet v. Johnson*, 169 Cal. App. 2d 630, 337 P.2d 499 (1959) ................................................. 15

*United Steel Workers v. Conoco-Phillips Co.*, 593 F.3d 802 (9th Cir. 2010) ................................ 20

*Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)............................................... 23

*Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588 (N.D. Cal. 2014) ................................... 12, 19, 23

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).............................................. 12, 13, 15, 17

*White v. Ultramar, Inc.*, 21 Cal. 4th 563, 88 Cal. Rptr. 2d 19 (1999).......................................... 17

*Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168 (9th Cir. 2010)............................. 24

STATUTES

Cal. Civ. Code § 3294 ...................................................................................................... 16, 17

Cal. Civ. Code § 3360 ........................................................................................................... 15

Fed. R. Evid. 410................................................................................................................... 18

Fed. R. Civ. P. 23 ................................................................................................ 1, 11, 23

**OTHER AUTHORITIES**

Cal. Civ. Jury Instr. (CACI) No. 303 ............................................................................ 13

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This lawsuit is brought on behalf of nearly ███████ Facebook users whose personal information was surreptitiously and knowingly transmitted by Facebook to third-party advertisers, in breach of Facebook's contracts with its users and contrary to Facebook's repeated, emphatic promises that it did not and would not make such disclosures.

When each of these Facebook users clicked on a third-party advertisement, Facebook ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Each of these users was denied the benefit of their bargain with Facebook, under which the user should have been able to exchange consent to disclosure for valuable consideration on a per-transaction basis. Thus, each user was damaged in an ascertainable amount.

This lawsuit is particularly appropriate for class treatment under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure ("Rule 23"). Class members' identities are ascertainable from Facebook's own records. All of the mandatory requirements for class certification – numerosity, commonality, typicality, and adequacy of representation – are met. Facebook's records show that Plaintiff Wendy Marfeo was one of the nearly ██████ Facebook users whose user ID and/or username were unlawfully disclosed to advertisers in the above-summarized manner. The information Facebook has produced thus far indicates that the other named Plaintiff, Katherine Pohl, did not experience such disclosure because ██████████████████████████ ██████████████████████████ However, Plaintiffs have enlisted two

other Facebook users who are ready, willing, and able to serve as representatives or co-representatives of the class if necessary.

The numerous common issues as to Plaintiffs' claims for breach of contract and fraud – *e.g.*, the existence of contracts, performance or excused non-performance, Facebook's breach, Facebook's false representations, its knowledge of falsity and intent to induce reliance, justifiable reliance, and issues pertaining to damages – clearly predominate over any arguable individual issues. And class treatment is the superior means of resolving these claims, because it would serve judicial economy and best protect the rights of absent class members.

## II.   STATEMENT OF ISSUES TO BE DECIDED

1.   **Primary issue**:  Whether this Court should certify the following class:  All Facebook users in the United States who, at any time after May 28, 2006, clicked on a third-party advertisement displayed on Facebook.com configured to redirect the user to an external website, and which resulted in Facebook's capture of a referer header containing that user's Facebook user ID and/or username?

2.   **Subsidiary issue**:  May each class member and each qualifying ad click be ascertained from Facebook's ad click database?

## III.   STATEMENT OF THE RELEVANT FACTS

### A.   Facebook's Agreements with its Users.

Facebook is a social networking website whose stated mission is "to give people the power to share and make the world more open and connected." Req. for Jud. Notice ("RJN") ¶1, Exh. 1. By using or accessing Facebook in 2009 and 2010, persons agreed to Facebook's Statement of Rights and Responsibilities ("Statement") and its Privacy Policy. Decl. of K. Nassiri ("Nassiri Decl.") ¶¶4-5, Exhs. 2-4 [opening paragraph and ¶1 of each version of Statement], Exh. 5 [1st page]; RJN ¶¶2-3, Exhs. 6, 7 [¶1, "Scope" of each].

The Statement prohibited Facebook users from, among other things, providing "any false personal information on Facebook." Nassiri Decl. ¶4, Exhs. 2-4 [¶¶4 *et seq.* of each]. Facebook explicitly reserved the right to terminate the accounts of users who violated their contractual

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

obligations. *Id.*, Exh. 2-4 [¶14 of each]. In consideration for these obligations, the Statement

promised users: "***We do not give your content or information to advertisers without your***

***consent***." Nassiri Decl. ¶4, Exhs. 2-4 [¶10.2 of each] (emphasis added). The Statement also

provided that it shall be governed by California law. *Id.* [¶15 of each].

The versions of Facebook's Privacy Policy dated December 9, 2009 (¶4) and April 22,

2010 (¶5) explicitly guaranteed as follows to Facebook users:

**How We Use Your Information**

\*        \*        \*        \*

**To serve personalized advertising to you**. We don't share your information with
advertisers without your consent. (An example of consent would be if you asked us
to provide your shipping address to an advertiser to receive a free sample.) We
allow advertisers to choose the characteristics of users who will see their
advertisements and we may use any of the non-personally identifiable attributes we
have collected (including information you may have decided not to show to other
users, such as your birth year or other sensitive personal information or
preferences) to select the appropriate audience for those advertisements. For
example, we might use your interest in soccer to show you ads for soccer
equipment, but we do not tell the soccer equipment company who you are ….

RJN. ¶¶2-3, Exh. 6 [¶4], Exh. 7 [¶5]; Nassiri Decl. ¶5, Exh. 5 (p. 7, "Third Party Advertising").

In an April 5, 2010 post on the official Facebook Blog, Facebook's then-Director of

Corporate Communications and Public Policy addressed the concerns of users who "asked to be

opted-out of having their information shared with advertisers":

… *This reflects a common misconception about advertising on Facebook. We
don't share your information with advertisers unless you tell us to (**e.g.** to get a
sample, hear more, or enter a contest). Any assertion to the contrary is false.
Period.* Instead, we allow advertisers to target anonymized demographics and
attributes. That is, a company selling boats can target people between 40 and 50
years old who expressed an interest in boating. However, *we never provide the
advertiser any names or other information about the people who are shown, or
even who click on, the ads.*

RJN ¶4, Exh. 8 (p. 1) (emphasis added). Responding to similar widespread user concerns,

Facebook's Chief Executive Officer, Mark Zuckerberg, made these assurances in a Facebook Blog

post on February 16, 2009:

Our philosophy is that people own their information and control who they share it
with. When a person shares information on Facebook, they first need to grant

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS
CERTIFICATION
CASE NO. 10-CV-02389-RMW**

1   Facebook a license to use that information so that we can show it to the other
    people they've asked us to share it with. Without this license, we couldn't help
2   people share that information.

3   …

4   In reality, we wouldn't share your information in a way that you wouldn't want.
    The trust you place in us as a safe place to share information is the most important
5   part of what makes Facebook work….

6   Nassiri Decl. ¶7, Exh. 9.

7       **B.      Facebook's Nonconsensual Disclosures of Users' Personal Information.**

8       A May 21, 2010 article in the *Wall Street Journal* (the "WSJ Article") revealed that

9   Facebook had violated its promises not to disclose user identities to advertisers.  The WSJ Article

10  reported that Facebook had been sending data to advertising companies that could be used to find

11  Facebook users' names and other personal details. Nassiri Decl. ¶8, Exh. 10.

12      On May 24, 2010, an article by Facebook engineer Matt Jones titled "Protecting Privacy

13  with Referrers" was posted on the "Facebook Engineering" page.  Nassiri Decl. ¶9, Exh. 11. Jones

14  stated that Facebook recently had "quickly fixed an issue after being contacted by a Wall Street

15  Journal reporter regarding an unintentional oversight in the data shared with our advertisers by

16  your browser when you click some ads on Facebook." This data—including the user ID of the

17  Facebook user who clicked on the ad—was revealed "in the referrer link visible to advertisers

18  when someone clicked on an ad." *Id*., Exh. 11 [1st page].

19      As Jones explains in a declaration he submitted ("Jones Decl.") (Dkt. 245; RJN ¶5, Exh.

20  12) in support of Facebook's Motion to Dismiss Plaintiffs Katherine Pohl and Wendy Marfeo for

21  Lack of Standing (Dkt. 243 *et seq*.), each item of content on the Internet has a unique resource

22  locator ("URL") which differentiates it from other content. When a person clicks a link on one

23  web page that directs to a second page, a "referer header" is sent by the user's web browser to the

24  web server for the second page. As a function of how the Internet and Internet browsers work in

25  general, referer headers typically contain certain information, including the URL of the page the

26  user was on when clicking the link to the second page. Jones Decl. ¶2. A URL invariably includes

27  the web page's domain name; thus, the URL for every page on Facebook includes

28
**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS
CERTIFICATION
CASE NO. 10-CV-02389-RMW**

1   "facebook.com/".  However, █████████████████████████████████████

2 █████████████████████████████████████████████████████████. Depo. of

3   J.E. Hung ("Hung Depo.") 155-56 (Nassiri Decl. ¶11, Exh. 13).

4        Facebook chose to design the URLs of its users' profile pages so that they routinely

5   include users' Facebook user ID or username, ██████████████████████████████

6 ███████████████. For example, "for a user with the username johndoe, the URL

7   might be www.facebook.com/johndoe." Jones Decl. ¶2. In addition, prior to July 2010, Facebook

8   included "a particular string of characters in users' profile page URLs ('ref=profile') when the

9   user took certain steps to navigate to his or her own profile page." *Id*. ¶6. Thus, due to Facebook's

10   own design decisions, a referer header generated when a Facebook user clicked an ad contained

11   both the "ref=profile" string and the person's user ID or username, thereby revealing the user's

12   identity. *Id*. ¶¶6-7; Hung Depo. 155-56.

13        This unauthorized disclosure of user IDs and usernames to advertisers was not a glitch in

14   the system, as Facebook insists, but a known and intended feature.  Like many websites, Facebook

15   uses the practice of "URL redirection," in which a web server redirects a visitor to a URL different

16   from the one the visitor requested.  And like many advertising platforms, Facebook uses ████

17 ████████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████████████████

19 ████████████████████████████████. This process is explained in the report of

20   Facebook's expert, James E. Hung. Nassiri Decl. ¶12, Exh. 14.

21        To summarize, when a user clicks an ad on Facebook, the user's browser sends a ████

22 █████████████████████████████████████████████████████████

23 █████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████

25 █████████████████████████████████████████████████████████

26 █████████████████████████████████████████████████████████

27 █████████████████████████████████████████████████████████

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**



1    ████. Nassiri Decl. ¶12, Exh. 14 [¶¶9-19 & Figure 2]. ███████████████████

2    ███████████████████████████████████████████. *Id.*

3    ████████████████████████████████████████████

4    ███████████████████████████████████████████

5    ██████████████████████████████████████████

6    █████████████████. Nassiri Decl. ¶12, Exh. 14 [¶¶15-19 & Figure 2]. ████████

7    ███████████████████████████████████████. *Id.* ¶9, Exh. 11 (p. 3).

8    ███████████████████████████████████████████

9    ███████████████████████████████████████████

10   ██████████████████████████████████████████

11   ███████████████████ *Id.*

12   Contrary to its protestations of ignorance, ██████████████████████

13   ███████████████████████████████████████████

14   ███████████████████████████████████████████

15   ███████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ███████████████████████████████████████████

19   ██████████████████████████████████████████

20   ██████████████████████████████████████████

21   ██████████████████████████ *Id.* (emphasis added); *see also* Exh. 16.

22   Indeed, Facebook chose to delay "rolling out a change" until May 24, 2010, one business

23   day after its ███████████████ by the May 21, 2010 WSJ Article. Nassiri Decl., Exhs. 11, 15.

24   Jones's May 24, 2010 post revealed that Facebook had been working "for the past few months" on

25   "completely remov[ing] all user IDs from appearing in referrer links before web browsers send the

26   links to external websites, including to advertisers."  *Id.* ¶9, Exh. 11 (p. 1). Jones discussed several

27   alternatives to the 302 status code, and stated that Facebook ultimately implemented "redirect

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

1   methods that work in all the major browsers, even if none of them works in every browser."[1] As

2   the evidence shows beyond dispute, each of these alternatives was available to Facebook all along.

3   *Id*. ¶9, Exh. 11 (pp. 3-5).

4          In supplemental interrogatory responses dated March 17, 2015, Facebook stated that its



10          Nassiri Decl. ¶15, Exh. 17 [Rog Nos. 7, 8, 13]. In those sworn responses, Facebook

11   claimed

12                                                                                          . *Id*.

13          However, in its most recent supplemental interrogatory responses dated May 6, 2015,

14   Facebook belatedly revealed it could,

15

16

17

18

19                                                                       Nassiri Decl. ¶16, Exh. 18

20   [Rog Nos. 7, 8, 13].

21                                                                                          *Id*.

22

23   ───────────────
     [1] As Jones discusses, certain combinations of status codes and browsers "result in a blank referrer"

24   being sent to the advertiser, which is "[g]ood for privacy, but bad for [the advertiser's] ability to
     understand where its traffic comes from," and therefore "[n]ot ideal" for Facebook.  Other

25   combinations fail to do anything at all.  But other combinations achieve the result Jones described
     as "perfect" for Facebook and its advertisers: the referer header shows Facebook's "redirect" page

26   ("a.com/redirect") – thus revealing to the advertiser that its traffic comes from Facebook – and
     removes the user ID, username, and URL of the page the user clicked. Nassiri Decl. ¶9, Exh. 11

27   (pp. 3-5).

28                                          **- 7 -**

1    Facebook was compelled by this Court to produce an ad click table with ████████

2    ████████████████████████████████████████████████████████████████████

3    ████████ Nassiri Decl. ¶17, Exh. 19. Although this produced table pertains only to ██████ users,

4    *id.*, Facebook has conceded it has ████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████ *Id.*, Exh.

7    18. Armed with just that username or user ID, the recipient (in this case, the advertiser) could type

8    in facebook.com/[username] or facebook.com/[userID] and be directed to that user's Facebook

9    profile page with the user's real name, pictures, etc. *Id.* ¶¶18-21, Exhs. 20, 21, 22, 23. The

10   advertiser then would have the option of sending that user a direct message via Facebook, since

11   any Facebook user "can send messages to anyone [else] on Facebook." RJN ¶6, Exh. 24.

12       Facebook claims that other factors prevent it from determining whether these ad clicks

13   resulted in transmission of a referer header with the "ref=profile character set" and the user ID or

14   username of a Facebook user. In particular, Facebook speculates that ████████████████

15   ████████████████████████████████████████████████████████████████████

16   ████████████████████████████████ Nassiri Decl. ¶15, Exh. 17 [Rog No.

17   7]. However, Facebook has offered no competent evidence of such measures. Its expert witness,

18   Hung, estimates that ████████████████████████████████████████████

19   ████████████████████████████████████ *Id.* ¶¶12, 22, Exh. 14 [¶33 n.18],

20   Exh. 25; Hung Depo. 131-36. But that number represents only ████████████████████

21   ████████████ – of the number of class members. Nassiri Decl. ¶16, Exh. 18. Facebook has

22   presented no evidence of ████████████████████████████████████████

23   ████████████████████ discussed by Hung. *See id.* ¶12, Exh. 14; Hung Depo. 123-25.

24       Facebook also opines that ████████████████████████████████████████

25   ████████████████████████████████████████. Nassiri Decl. ¶15, Exh. 17

26   [Rog No. 7]. The only evidence Facebook has presented on this point is ████████████████

27   ████████████████████████████████████████████████████████████████

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

1   ███████████████████████████████████████████ *Id.* ¶12, Exh. 14

2   [¶¶53-54]. Facebook claims it cannot determine ████████████████████████

3   ████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████████████

5   ██████████████████████████████████████ *Id.* ¶¶15-16, Exhs. 17-18.

6        Facebook has an "████████████████████████████████████████████

7   ████████████████████████████████████████ Jones Decl. ¶¶9-10.

8   Presumably, the ████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████

10   ██████. Hung's notes pose the question: ████████████████████████████

11   ████████████████████████████████ Nassiri Decl. ¶23, Exh. 26. This further

12   raises an inference that Facebook's own records identify which Facebook users are class members

13   and which are not.

14        **C.     Class Members' Damages Resulting from Facebook's Conduct.**

15        Facebook denied class members the benefit of their bargain with Facebook by

16   surreptitiously divulging their personal information to advertisers. Facebook's Privacy Policy

17   contemplated users ***exchanging*** consent for valuable consideration (*e.g.*, "to receive a free

18   sample") on a per-transaction basis. RJN ¶¶2-3, Exh. 6 [¶4], Exh. 7 [¶5]. This sort of exchange of

19   value between consumers and advertisers (or marketers) is now routine and commonplace.

20   Marfeo testified that she has participated in various companies' "rewards" programs, where she

21   provided the companies her name, email and home address, and Facebook and Twitter pages, and

22   in exchange received tangible benefits such as coupons for free sodas, a beach chair and table, and

23   t-shirts. Pohl testified that she has entered into similar exchanges with advertisers. Depo. of W.

24   Marfeo 129-31, 219-27; Depo. of K. Pohl 43-47 (Nassiri Decl. ¶¶24-25, Exhs. 27, 28).[2]

25   _____

26   [2] There is abundant evidence, particularly on the Internet, of opportunities for individual
     consumers to exchange their information with advertisers for valuable consideration. For example,
27   Google routinely offers up to $1,000 of ***per-order*** purchase protection to consumers who agree to
     share their order information and email address with Google. *See* Google Trusted Stores Customer

28   _____
- 9 -

The evidence shows this type of consumer information has become commoditized and has an ascertainable monetary value. ████████████████████████████████████████ ██████████████████████████████████████████. Depo. of F. Vickery ("Vickery Depo.") 28-29, 57-63, 69-71, 73-74, 84, 87, 89-100, 104-06, 109-10, 113, 127-30, 132-33, 226-28, 244-47; Nassiri Decl. ¶¶26-28, Exhs. 29, 30, 31. ████████████████████████████ ████████████████████████████████████████████████████ ███████████████████. *See, e.g.,* Vickery Depo. 57-63, 69-71, 89-94 (referring to ████████ ██████████████████); Nassiri Decl. ¶¶27-28, Exhs. 30, 31. ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████. Vickery Depo. 69-71, 92-97, 104-06. ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████. Vickery Depo. 96-98. The advertiser may also contact the user directly by sending a message via Facebook, like any Facebook user can do. RJN ¶6, Exh. 24. Thus, class members are entitled to damages based on the ████████████████████████████████████████ Vickery Depo. 69-71, 92-98, 104-06, 109-10, 113, 127-30, 132-33, 226-28, 244-47.

## IV.    ARGUMENT

### A.    Class Certification Should Be Granted Under Rule 23.

This Court has broad discretion to determine whether a class should be certified. *See, e.g.,* *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001). In deciding a class certification motion, courts focus on whether the requirements of Rule 23 have been satisfied, rather than who will prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). Rule 23(a) sets forth four mandatory prerequisites for class certification:  (1) the class must be so numerous to

---

Help, https://support.google.com/trustedstores/answer/1669761?hl=en&ref_topic=4544280 (last visited Oct. 27, 2015).

render joinder of all members "impracticable"; (2) there are common factual or legal questions; (3) the representatives' claims or defenses are "typical" of those of the class; and (4) the representatives and their counsel must "fairly and adequately protect" class members' interests. Rule 23(b)(3) permits class certification where the common factual or legal questions "predominate" over individual questions, and where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(a), (b)(3).

"The court is bound to take the substantive allegations of the complaint as true" in determining the appropriateness of class certification. *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975). At this stage, "the court must only determine if the plaintiffs have proffered enough evidence to meet the requirements of FRCP 23, not weigh competing evidence." *Chun-Hoon v. McKee Foods Corp.*, No. C-05-620 VRW, 2006 WL 3093764, at *4 (N.D. Cal. Oct. 31, 2006) (citations omitted).

**B.      An Identifiable and Ascertainable Class Exists.**

As a threshold matter, parties seeking class certification must establish the existence of an identifiable and ascertainable class, and provide a precise, objective, and presently ascertainable class definition. *Brazil v. Dell Inc.*, No. C–07–01700 RMW, 2010 WL 5387831, at *2 (N.D. Cal. Dec. 21, 2010). Plaintiffs seek to certify the following class: All Facebook users in the United States who, at any time after May 28, 2006, clicked on a third-party advertisement displayed on Facebook.com configured to redirect the user to an external website, and which resulted in Facebook's capture of a referrer header containing that user's Facebook user ID and/or username. As the discussion herein shows, this definition bases class membership on "a set of objective criteria, making the class easily identifiable and sufficiently ascertainable for certification." *Id.*

**C.      The Class Meets All Requirements Under Rule 23(a).**

**1.      The Class is Sufficiently Numerous.**

"There is no absolute minimum number of plaintiffs necessary to demonstrate that the putative class is so numerous so as to render joinder impracticable." *Breeden v. Benchmark Lending Group, Inc.*, 229 F.R.D. 623, 628 (N.D. Cal. 2005). However, courts have found

numerosity satisfied when the class comprises as few as 40 members. *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605-06 (N.D. Cal. 2014).  Where, as here, there is "a nationwide class with millions of class members," numerosity "is clearly satisfied." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

### 2.    The Commonality Requirement Is Satisfied.

Commonality exists where class members' claims depend on at least one "common contention," which "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Even a "single common question" may satisfy this requirement. *Id*. at 2556; *accord Mazza v. American Honda Motor Co*., 666 F.3d 581, 589 (9th Cir. 2012) (even after *Wal-Mart*, "commonality only requires a single significant question of law or fact"); *Hanlon*, 150 F.3d at 1019 ("Rule 23(a)(2) has been construed permissively"; "[a]ll questions of fact and law need not be common to satisfy the rule"); *Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008) ("The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.").

Commonality exists where class members allegedly "have suffered the same injury," *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982), such as breach of the same contract. *DuFour v. Be LLC*, 291 F.R.D. 413, 418 (N.D. Cal. 2013) (commonality satisfied where defendant talent agency allegedly breached contracts with consumers by failing to provide services as of the date it went out of business); *see Jimenez v. Allstate Ins. Co*., 765 F.3d 1161, 1165-66 (9th Cir. 2014) (commonality satisfied where plaintiffs alleged employer had a practice or unofficial policy of requiring class member to work unpaid overtime "off the clock"); *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (commonality found where class members "received a debt collection letter at their place of employment without first giving their consent" in violation of federal statute); *Facciola v. Greenberg Traurig LLP*, 281 F.R.D. 363, 369

1  (D. Ariz. 2012) (commonality satisfied in securities case based on Ponzi scheme); *cf. Wal-Mart*,

2  131 S. Ct. at 2557 (no commonality where plaintiffs offered no evidence of any common approach

3  to exercising discretion that pervaded company and resulted in pay disparity based on gender).

4         **a.**  **Common Questions Exist on the Contract Claim.**

5    The essential elements of Plaintiffs' claim for breach of contract are: (1) existence of the

6  contract; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; and

7  (4) resulting harm or damage to plaintiff. *Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d

8  887, 913, 92 Cal. Rptr. 723 (1971); Cal. Civ. Jury Instr. (CACI) No. 303. All of these elements are

9  subject to common proof in this case.

10    By using or accessing Facebook, every class member agreed to Facebook's Statement and

11  Privacy Policy, which uniformly promised at all relevant times that Facebook would not share

12  users' personal information with advertisers without users' consent. Nassiri Decl. ¶¶4-5, Exhs. 2-4

13  [¶10.2 of each], Exh. 5 (p. 7); RJN ¶¶2-3, Exh. 6 [¶4], Exh. 7 [¶5]. Thus, the contract's existence

14  is a matter of common classwide proof.  This is sufficient, by itself, to satisfy Rule 23(a)(2)'s

15  commonality requirement. *See DuFour*, 291 F.R.D. at 418 (although certain contract features

16  "such as the price and duration terms" were not uniform, plaintiffs established commonality by

17  identifying relevant uniform treatment of class members).

18    Commonality also exists as to class members' performance or excused non-performance of

19  their contractual obligations, particularly their provision of no "false personal information."

20  Nassiri Decl. ¶4, Exhs. 2-4 [¶¶4 *et seq*. and 14 of each]. Facebook records should show whether

21  any class members' accounts were terminated for violating their contractual obligations. *See id*.

22  ¶¶15-21, Exhs. 17-23. For those class members whose accounts were not terminated by Facebook,

23  the common inference would be that either they satisfied their obligations or Facebook excused

24  any alleged non-performance by not terminating their accounts. *See* CACI No. 303.

25    Commonality further exists as to Facebook's breach. When each class member clicked on

26  a third-party advertisement on Facebook.com ███████████████████████████████

27  ███████████████████████████████████████████████████████████████████████

28  **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

1   ███████████████████████████████████████████████████████

2   ████. *See* pp. 4-9, *supra*; Nassiri Decl. ¶¶8-14, Exhs. 10-16. As discussed below (p. 22), nothing

3   more is required to establish that Facebook breached its contracts with class members.

4           Lastly, common factual and legal questions exist as to contract damages. "At class

5   certification, plaintiffs must present a likely method for determining class damages, though it is

6   not necessary to show the methods will work with certainty." *Brazil*, 2010 WL 5387831 at *5.

7   Here, Facebook's breach caused each class member to be ███████████████████

8   ████████████████████████████████████████████████████████

9   ███████████████████████████████████████ Vickery Depo.

10  69-71, 92-98, 104-06, 109-10, 113, 127-30, 132-33, 226-28, 244-47; pp. 9-10, *supra*. It is a

11  common question whether, under the contract and Facebook's promises, class members had a

12  reasonable expectation of an exchange of value with respect to consent on a per-transaction basis.[3]

13  Under contract law, "the party injured by a breach should receive as nearly as possible the

14  equivalent of the benefits of performance," with the aim of placing the injured party "in as good a

15  position as [s]he would have been had performance been rendered as promised. This aim can

16  never be exactly attained yet that is the problem the trial court is required to resolve." *Brandon &*

17  *Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 455, 277 Cal. Rptr. 40

18  (1990). Here, Plaintiffs submit that the ████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████ Vickery Depo. 87; pp. 9-10, *supra*. ████████████████████

21  ████████████████████████████████████. Vickery Depo. 104-

22  06, 113, 127-30, 132-33.

23

24  _____

25  [3] Unlike many privacy cases, Plaintiffs here are not suggesting that their ability to monetize their
    personal information in general was diminished or lost by virtue of Facebook's non-consensual

26  disclosures. Instead, Plaintiffs maintain that in order to obtain the benefit of their bargain, under
    the promises in Facebook's Statement and Privacy Policy, they were entitled to receive valuable

27  consideration from Facebook on a per-transaction basis for the specific disclosures that form the
    basis of this lawsuit.

28

- 14 -

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS**
**CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

1  And even if the common question of ascertainable monetary damages were to be resolved

2  against the class, this would raise yet another common question – the availability of nominal

3  damages to class members. As this Court has recognized, "[a] plaintiff is entitled to recover

4  nominal damages for the breach of a contract, despite inability to show that actual damage was

5  inflicted upon him, since the defendant's failure to perform a contractual duty is, in itself, a legal

6  wrong that is fully distinct from the actual damages." *Farhang v. Indian Inst. of Tech.*, No. C–08–

7  02658 RMW, 2010 WL 2228936, at * 7 (N.D. Cal. June 1, 2010) (denying motion to dismiss

8  "even if plaintiffs cannot prove actual damages") (quoting *Sweet v. Johnson*, 169 Cal. App. 2d

9  630, 632, 337 P.2d 499 (1959)); Cal. Civ. Code § 3360 ("When a breach of duty has caused no

10  appreciable detriment to the party affected, he may yet recover nominal damages."); *accord*

11  *MindGames, Inc. v. Western Pub. Co.*, 218 F.3d 652, 654 (7th Cir. 2000) ("the victim of a breach

12  of contract is entitled to nominal damages").

13  These common questions, separately and together, will "generate common answers apt to

14  drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis omitted); *Mazza*,

15  666 F.3d at 588. Thus, commonality is satisfied as to the contract claim.

16  **b.      Common Questions Exist on the Fraud Claim.**

17  The essential elements of Plaintiffs' other remaining claim, for fraud, are: (1) a false

18  representation; (2) knowledge of falsity; (3) intent to induce reliance; (4) justifiable reliance; and

19  (5) resulting damage. *Engalla v. Permanente Med. Group, Inc.*, 15 Cal. 4th 951, 974, 64 Cal. Rptr.

20  2d 843 (1997). All of these elements are subject to common proof.

21  The evidence shows that Facebook made multiple false assurances that it would not

22  disclose users' personal information to advertisers – in the Statement, Privacy Policy, and Privacy

23  Guide, and in Facebook blog posts by Facebook's CEO and other corporate officials.  Nassiri

24  Decl. ¶¶4-7, Exhs. 2-4 [¶10.2 of each], Exh. 5 (p. 7), Exh. 9; RJN ¶¶2-4, Exh. 6 [¶4], Exh. 7 [¶5],

25  Exh. 8 (p. 1). Facebook's own internal emails show ████████████████████████

26  ████████████████████████████████████████████████████████ Nassiri

27  Decl. ¶¶13-14, Exhs. 15-16. Facebook's intent to induce reliance is established by the emphatic

28

1   nature of the representations themselves, particularly the April 2010 Facebook blog assurances

2   that "we never provide the advertiser any names or other information" about people who click on

3   ads and that "[a]ny assertion to the contrary is false," as well as revisions to the Statement and

4   Privacy Policy – ***all of which were made after Facebook plainly had knowledge of the falsity of***

5   ***the representations***.   Nassiri Decl., Exhs. 3-4; RJN, Exhs. 6-8.  Each of these elements is subject

6   to common proof from Facebook's own evidence. *See Brazil*, 2010 WL 5387831 at *5.

7          Common proof also exists of justifiable reliance. As discussed above at page 2, Facebook

8   deems all persons who use or access Facebook to have agreed to its Statement and Privacy Policy,

9   both of which explicitly assure users that Facebook will not share their personal information with

10  advertisers, and common evidence also exists as to whether class members provided their real

11  names to Facebook.  Under California law, "an inference of reliance arises if a material false

12  representation was made to persons whose acts thereafter were consistent with reliance upon the

13  representation." *Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355, 363, 134 Cal. Rptr. 388

14  (1976). This inference is common to all class members. *Brazil*, 2010 WL 5387831 at *5.

15         Common factual and legal questions likewise exist as to fraud damages. The ordinary

16  measure of fraud damages in California is "out-of-pocket" loss, which constitutes the difference in

17  actual value at the time of the transaction between what the plaintiff gave and what he or she

18  received. *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1240, 44 Cal. Rptr. 2d 352 (1995).

19  As with the contract claim, there is a common factual question as to whether class members'

20  consent to divulge their personal information has an ascertainable monetary value on a per-

21  transaction basis. Vickery Depo. 69-71, 92-98, 104-06, 109-10, 113, 127-30, 132-33, 226-28, 244-

22  47; pp. 9-10, *supra*. In the context of fraud, the more specific common question is whether this

23  value exceeds the value of any per-transaction benefit the class members received from Facebook.

24  *See Alliance Mortgage*, 10 Cal. 4th at 1240; pp. 9-10, *supra*.

25         Common questions also exist as to whether Facebook's conduct, as discussed herein,

26  constitutes fraud, oppression, or malice, and whether class members are thereby entitled to

27  punitive damages on the fraud claim. Cal. Civ. Code § 3294(a). If such conduct is determined to

28

have been perpetrated by a Facebook employee, further common questions would be whether "an officer, director, or managing agent" of Facebook "authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." *Id.* § 3294(b); *see White v. Ultramar, Inc.*, 21 Cal. 4th 563, 577, 88 Cal. Rptr. 2d 19 (1999) (to be a "managing agent," a corporate employee must exercise "substantial discretionary authority over significant aspects of a corporation's business").

Any one of these common questions is apt to drive resolution of the fraud claim. Thus, each one suffices to satisfy Rule 23(a)(2). *Wal-Mart*, 131 S. Ct. at 2551; *Mazza*, 666 F.3d at 588.

### 3.    Typicality is Satisfied Here.

"Typicality is a permissive standard, and only requires that the named plaintiffs claims' are 'reasonably coextensive' with those of the class." *Dalton v. Lee Publications, Inc.*, 270 F.R.D. 555, 560 (S.D. Cal. 2010). Typicality exists where class representatives are members of the class and generally "possess the same interest and suffer the same injury" as the unnamed class members. *Falcon*, 457 U.S. at 156. "Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." *Smith*, 2008 WL 4156364 at *5 (internal citation omitted). "In examining this condition, courts consider whether the injury allegedly suffered by the named plaintiffs and the rest of the class resulted from the same alleged common practice." *Id.* (internal quotation omitted).

Here, there is no question that Plaintiff Marfeo's claims are typical of those of other class members. Marfeo clicked on multiple Facebook advertisements, and Facebook's own records show that ███████████████████████████████████████████ ████████████████████ Jones Decl. ¶20. Although the records Facebook has produced thus far indicate that Plaintiff Pohl ██████████████████████████████████████████ ████████████, *id.* ¶19, Plaintiffs need only demonstrate typicality as to at least one class representative, and they clearly have done so.

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

4.      **Plaintiffs and Their Counsel Will Adequately Represent the Interests of Class Members.**

To satisfy Rule 23(a)(4)'s adequacy prong, class counsel must be qualified and competent; the class representatives and their counsel must not have a conflict of interest with the rest of the class; and they must "prosecute the action vigorously" on behalf of the class. *In re Mego Financial Corp. Secur. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000); *Brazil*, 2010 WL 5387831 at *3. Where there is more than one named class representative, the "adequacy" requirement is satisfied as long as any one of them is adequate. *Rodriguez v. West Pub. Corp.*, 563 F.3d 948, 961 (9th Cir. 2009).

All of the prerequisites for adequacy are met here. Plaintiffs have retained counsel with extensive expertise and experience in prosecuting class actions and other major complex litigation. Nassiri Decl. ¶31, Exh. 33. In this very litigation, Plaintiffs' counsel successfully appealed to the Ninth Circuit to reverse a judgment on a motion to dismiss as to the contract and fraud claims. *In re Facebook Privacy Litig.*, 572 Fed. App'x. 494, 495 (9th Cir. 2014).

There also is no potential conflict between the named Plaintiffs (or their counsel) and absent class members.  They are challenging the same conduct by Facebook, which resulted in all class members' personal information being disclosed to advertisers, and seek to benefit all class members by obtaining damages for them.

Facebook has suggested it may rely on Plaintiff Marfeo's plea of *nolo contendere* to embezzlement in Rhode Island state court.  However, such evidence is inadmissible against Marfeo in this civil case.  Fed. R. Evid. 410(a)(2). And even an admissible felony record would not *per se* disqualify a class representative. *Randle v. Spectran*, 129 F.R.D. 386, 392 (D. Mass 1988) (citing *Haywood v. Barnes*, 109 F.R.D. 568, 579 (E.D.N.C. 1986)); *Stanich v. Travelers Indem. Co*., 259 F.R.D. 294, 314-15 (N.D. Ohio 2009) ("the general rule . . . is that unrelated unethical or even criminal conduct is not sufficient to support a finding of inadequacy"). As discussed herein, the vast majority of the evidence of common issues in this case comes from Facebook itself. *See* pp. 2-10 & 12-17, *supra*. Thus, any attack by Facebook on Marfeo's credibility would not interfere with Plaintiffs' ability to meet their burden of proof on issues such as the existence of a contract, performance or excused non-performance, breach, falsity of

1  Facebook's representations, knowledge of falsity, justifiable reliance, valuation of users' personal
2  information, etc.

3      Facebook has no admissible evidence that would render Marfeo an inadequate class
4  representative. In any event, Plaintiffs have two other individuals, Jesse Tarli and Gilbert
5  Mendoza, who are ready, able, and willing to serve as class representatives, Nassiri Decl. ¶29,
6  particularly if this Court should determine that Marfeo or Pohl are inadequate.[4] *See Robinson v.*
7  *Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999) (court may increase the number of
8  class representatives if named representative is found to be inadequate).

9      **D.    The Class Satisfies the Requirements of Rule 23(b)(3).**

10         **1.    Common Questions Predominate Over Individualized Issues.**

11     "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently
12  cohesive to warrant adjudication by representation." *Smith*, 2008 WL 4156364 at *8 (quoting
13  *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)). "Because no precise test can
14  determine whether common issues predominate, the court must pragmatically assess the entire
15  action and the issues involved." *Chun-Hoon*, 2006 WL 3093764 at *2 (quoting *Romero v.*
16  *Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 489 (E.D. Cal. 2006)). The Court "must determine
17  whether the elements necessary to establish liability . . . are susceptible to common proof or, if
18  not, whether there are ways to manage effectively proof of any element that may require
19  individualized evidence." *Villalpando*, 303 F.R.D. at 608. Courts thus separate the issues subject
20  to "generalized proof" from those subject to "individualized proof" to determine whether plaintiffs
21  have satisfied predominance. *Delagarza v. Tesoro Ref. & Mktg. Co.*, No. C–09–5803 EMC, 2011
22  WL 4017967, at *10 (N.D. Cal. Sept. 8, 2011). Challenges to plaintiffs' legal theories and doubts
23  about their ability to prevail at trial are irrelevant in determining whether common issues

24  ─────────────
    [4] Facebook's records show that both Tarli and Mendoza clicked on advertisements on Facebook
25  that generated a ref=profile string. Nassiri Decl. ¶30, Exh. 32. As discussed herein, Facebook also
    has ███████████████████████████████████████████████████
26  ████████████████████████████████████████████████████████████████████████████
    ████████████████████████████████████████████
27                                              However, Facebook has not yet produced
    such information as to Tarli or Mendoza. *Id.*

28  ─────────────────────────────── - 19 - ───────────────────────────────

predominate. *United Steel Workers v. Conoco-Phillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010).

The discussion above at pages 12-17 demonstrates the predominance of common questions on every essential element of Plaintiffs' claims for breach of contract and fraud:

- Whether contracts exist between Facebook and each class member under which Facebook was obligated not to share class members' personal information without their consent with advertisers?

- Whether the class members performed their contractual obligations, particularly to not provide false information?

- Whether any non-performance of these obligations was excused by Facebook not exercising its contractual prerogative to terminate users' accounts for violation of the obligations?

- Whether Facebook breached its contracts with class members by causing their personal information to be transmitted via referer headers to advertisers in the ordinary course of how the Internet works?

- Whether Facebook falsely represented that it would not disclose users' personal information to advertisers?

- Whether Facebook knew of the falsity of such representations when they were made?

- Whether Facebook intended to induce class members to rely on these representations?

- Whether class members justifiably relied on these representations?

- Whether Facebook's breach caused each class member to be deprived of the benefit of their bargain with Facebook?

- Whether, under the contract and Facebook's promises, class members had a reasonable expectation of an exchange of value with respect to consent on a per-transaction basis?

- Whether the disclosed personal information has an ascertainable monetary value?

1      •     Whether the monetary value of users' consent to divulge their personal information

2 on a per-transaction basis exceeds the value of any per-transaction benefit the class members

3 received from Facebook?

4      •     Whether class members are entitled to nominal damages for breach of contract?

5      •     Whether Facebook's conduct constitutes fraud, oppression, or malice?

6      •     Whether such conduct was committed by a Facebook employee, and if so, whether

7 a Facebook officer, director, or managing agent authorized or ratified the wrongful conduct, or

8 was personally guilty of oppression, fraud, or malice?

9      •     Whether class members are entitled to punitive damages for fraud?

10     Plaintiffs anticipate that Facebook will focus on ostensible individual issues regarding

11 ███████████████████████████████████████████████████

12 ██████████████████████████████████████████████ Nassiri

13 Decl. ¶15, Exh. 17 [Rog No. 7]. However, the estimates of Facebook's own expert show that ███

14 ██████████████████████████████████████████████████████

15 ███████████████████████████████████ *Id*. ¶¶12, 16, 22, Exh. 14 [¶33 n.18],

16 Exhs. 18, 25; Hung Depo. 131-36. There is no evidence at all of ████████████████████

17 █████████████████████████████████████. Nassiri Decl.

18 ¶12, Exh. 14; Hung Depo. 123-25. Facebook can only speculate that any class member actually

19 utilized such measures, and speculation is an incompetent basis for opposing class certification.

20 *See* Fed. R. Evid. 602, 701.

21     Moreover, Facebook's own ██████████████████████████

22 ██████████████████████████████████████████████. Jones

23 Decl. ¶¶9-10; *see* Nassiri Decl. ¶23, Exh. 26.  "Common issues predominate where individual

24 factual determinations can be accomplished using computer records, clerical assistance, and

25 objective criteria – thus rendering unnecessary an evidentiary hearing on each claim." *Smilow v.*

26 *Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003); *see Ira Holtzman, C.P.A. v.*

27 *Turza*, 728 F.3d 682, 684-85 (7th Cir. 2013) (predominance satisfied where records established

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

1    which illicit facsimile transmissions "were received and which were not").

2        Likewise, any perceived individual issues regarding whether class members performed

3    their contractual obligations do not predominate over the common issues discussed herein. As

4    discussed above, Facebook retained the right to terminate user accounts for providing Facebook

5    with false information. Facebook's records would show whether any class members' accounts

6    were terminated for this reason, and non-termination would raise an inference that class members

7    fulfilled their obligations or that Facebook excused any non-performance. Nassiri Decl. ¶¶4, 15-

8    21, Exhs. 2-4 [¶¶4 *et seq.* and 14 of each], Exhs. 17-23. Another way of answering any such

9    questions would be when class members submit claim forms, which typically require the member

10   to state her correct name, contact information and Social Security Number under penalty of

11   perjury. *Id.* ¶32. If the information on this form does not match that given by the class member to

12   Facebook, then the person could be excluded from the class. *Cf. Smilow*, 323 F.3d at 40.

13       Any attempt by Facebook to argue individual issues as to the reliance element of the fraud

14   claim would fare no better. As discussed above at page 16, there is an inference of reliance

15   because Facebook made materially false representations that it would not disclose users' personal

16   information to advertisers, and class members' subsequent acts of providing their personal

17   information were consistent with reliance. *Occidental Land*, 18 Cal. 3d at 363; *Brazil*, 2010 WL

18   5387831 at *5.

19       In its Motion to Dismiss Plaintiffs Katherine Pohl and Wendy Marfeo for Lack of

20   Standing, Facebook argues that "Plaintiffs have no evidence that any third party ever received and

21   logged their so-called 'personal information,' that any third party was aware that they may have

22   possessed such information, or that any third party actually used this information in any way."

23   (Dkt. 243 at 6). However, the discussion above at pages 4-9 shows Plaintiffs do, in fact, have

24   evidence that advertisers received referer headers containing class members' user IDs or

25   usernames. Facebook has offered ***no legal authority*** for the proposition that Plaintiffs must show

26   that advertisers "logged" this information, "actually used" it, or even were aware of it, to establish

27   a claim for breach of contract or fraud. Even if these were deemed to be individual questions, at

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**

1   most they would pertain to damages, and as such would be legally insufficient to defeat class

2   certification in and of themselves. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513-14 (9th Cir.

3   2013) (district court abused its discretion by denying class certification "because for each sub-

4   class 'the damages inquiry will be highly individualized'"); *Blackie*, 524 F.2d at 905 ("The

5   amount of damages is invariably an individual question and does not defeat class action

6   treatment"); *cf. Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) ("a model purporting to

7   serve as evidence of damages in this class action must measure only those damages attributable to

8   that theory").

9          The discussion herein demonstrates that Plaintiffs' proposed class is "sufficiently cohesive

10   to warrant adjudication by representation." *Amchem Prods.,* 521 U.S. at 623. To the extent any

11   individual issues exist, they do not predominate, but instead are capable of being managed

12   effectively in a class adjudication. *Villalpando*, 303 F.R.D. at 608. Accordingly, Plaintiffs have

13   satisfied the "predominance" prong of Rule 23(b)(3).

14              **2.      Class Litigation Is the Superior Means of Resolving Class Members' Claims.**

15

16          Where "classwide litigation of common issues will reduce litigation costs and promote

17   greater efficiency, a class action may be superior to other methods of litigation." *Valentino v.*

18   *Carter–Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996). A district court has "broad

19   discretion" in determining whether class treatment is superior. *Kamm v. California City Dev. Co.*,

20   509 F.2d 205, 210 (9th Cir. 1975). The following factors are pertinent to this analysis: (A) any

21   interest class members might have "in individually controlling" prosecution of separate actions;

22   (B) whether there is any other litigation concerning the controversy; (C) whether it is desirable to

23   concentrate litigation of the claims in this forum; and (D) any "likely difficulties in managing a

24   class action." Fed. R. Civ. P. 23(b)(3).

25          The superiority requirement is easily satisfied here. Where, as here, "recovery on an

26   individual basis would be dwarfed by the cost of litigating on an individual basis, this factor

27   weighs in favor of class certification." *Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d

28

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS
CERTIFICATION
CASE NO. 10-CV-02389-RMW**

1168, 1175 (9th Cir. 2010). The parties also know of no individual lawsuits concerning the instant controversy, but only other class actions which were transferred to this Court, stayed, and administratively closed pending this action. Nassiri Decl. ¶33. Moreover, there would not be significant difficulties in managing this matter as a class action. ████████████████████ ██████████████████████████████████████████████████████████████. *Id.* ¶¶16-21, Exh. 18 [Rog Nos. 7, 8, 13], Exhs. 19-23. Accordingly, maintenance of this litigation as a class action would be efficient, fair, and superior to maintenance of potentially numerous individual actions pertaining to the same set of common issues of law and fact. *Wolin*, 617 F.3d at 1175-76; *see Barkouras v. Hecker*, Civ. No. 06-0366 (AET), 2006 WL 3544585 at *4 (D.N.J. Dec.8, 2006) ("As the Court is forced to select from outcomes ranging from no suits being brought at all, to first-come Plaintiffs rendering Defendants bankrupt, or a class action proceeding whereby its members may receive nominal damages, the Court finds that the class action disposition is superior to all other forms of adjudicating this dispute.").

## V.      CONCLUSION

Plaintiffs respectfully ask the Court to grant their Motion for Class Certification.

Dated: October 28, 2015                          NASSIRI & JUNG LLP


                                                 /s/ Kassra P. Nassiri
                                                 Kassra P. Nassiri
                                                 Attorneys for Plaintiffs and the Putative Class

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR CLASS CERTIFICATION**
**CASE NO. 10-CV-02389-RMW**